JRB: 2024R00620

FILED ✓ ___ ENTERED
___ LOGGED ___ RECEIVED
3:03 pm, Jun 30 2025
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____M.D._____ Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| v. | *  CASE NO. 8:25-mj-1670 |
| EVESTER EDD, | * |
| | *  **FILED UNDER SEAL** |
| Defendant. | * |
| | ******* |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Sparky Edwards, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. This affidavit is being submitted in support of a criminal complaint alleging that **EVESTER EDD** violated the following federal criminal laws: 18 U.S.C. § 641 (theft of government property- over $1,000.00), 18 U.S. Code § 1001 (a) (statements or entries generally), and 18 U.S. Code § 1343 (fraud by wire, radio, or television), hereinafter the "TARGET OFFENSES."

2. I am a Senior Special Agent with the Office of Inspector General (OIG) for the United States Peace Corps (USPC). I am responsible for investigating fraud, waste, and abuse in USPC programs, and I am authorized under the Inspector General Act of 1978 to conduct criminal investigations, serve subpoenas, administer oaths and affirmations, carry a firearm, execute warrants and make arrests for offenses against the United States.

3. This affidavit is being submitted based on my personal knowledge, information provided to me by other law enforcement agents, law enforcement records, court-authorized searches, witness interviews, defendant interview, and my training and experience as well as the training and experience of other law enforcement agents.

1

4. Because I am submitting this affidavit for the limited purpose of supporting my application for a criminal complaint, I have not included all facts known to law enforcement, but only those facts necessary to establish probable cause that the defendant violated the federal criminal laws set forth herein.

**SUMMARY OF OFFENSE CONDUCT**

5. **EDD** has worked at numerous federal agencies over the course of his career. Most recently, until his suspension in November 2024, he was a permanent employee at the USPC. While an employee at the USPC, **EDD** was hired by outside contracting agencies to do humans relations work under contract to, respectively, the Federal Housing and Finance Agency (FHFA) and the Nuclear Regulatory Commission (NRC). This investigation has revealed **EDD**'s simultaneous work for multiple federal agencies as well as related false statements, theft, fraudulent claims, conflicts of interest, wire fraud and instances of exceeding authorized computer access.

6. The information obtained as a result of the investigation shows that **EDD** accessed and transferred agency documents from NRC, FHFA, and USPC computers and email accounts to a personal email address, and that he further accessed them on a cellular telephone seized at his then-residence, in Silver Spring, Maryland. **EDD** submitted time sheets to at least three different federal agencies for substantially overlapping periods of time, and he received payment from multiple agencies for putative work performed during the same periods of time. In other words, **EDD** was double-billing the United States.

7. Based on an interview of **EDD** on the date a court-authorized search warrant was executed, **EDD** transferred money he received from his double-billing scheme to third parties, and, furthermore, he communicated on more than one occasion with third parties regarding his fraudulent billing of the federal government.

**PROBABLE CAUSE**

8. USPC is an independent federal agency established in 1961. It is responsible for sending US Government (USGOV) volunteers to work in communities abroad to promote peace, understanding and friendship on behalf of the USGOV. USPC works on various projects throughout the globe, including AIDS education, business training, information infrastructure development, strengthening food security, promoting local economic opportunities, supporting student learning, protecting natural resources, and promoting healthy behaviors. USPC has a headquarters and headquarters staff in Washington D.C.

9. NRC is an independent federal regulatory agency which derives its authority from the Atomic Energy Act of 1954 and the Energy Reorganization Act of 1974, as amended. It is responsible for regulation and oversight of civilian uses of nuclear reactors, materials, and waste. To support this mission, the NRC awards contracts to commercial firms for certain services, including human resource services.

10. FHFA is an independent federal agency established the Housing and Economic Recovery Act of 2008 and is responsible for the effective supervision, regulation, and housing mission oversight of the Federal National Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), and the Federal Home Loan Bank System. FHFA's mission is to ensure that Fannie Mae and Freddie Mac and Federal Home Loan banks fulfill their mission by operating in a safe and sound manner to serve as a reliable source of liquidity and funding for housing finance and community investment. To support its mission, FHFA awards contracts to commercial firms for certain services, including human relations and employee labor services.

11. Under such a services contract, a company known as the ▮▮▮▮▮▮▮▮▮

▬▬▬▬▬▬ (▬▬), a primary contractor, provides personnel to support NRC human resources services. Also under this contract, the NRC has agreed to issue to contractor personnel certain items of U.S. government property. Contractor personnel are permitted to use this equipment to carry out their responsibilities under the ▬▬ contract, but it remains the property of the U.S. government.

12. Under another services contract, a company known as the ▬▬▬▬▬▬ (▬▬), a primary contractor, provided personnel to support FHFA human resources services. Also under this contract, the FHFA agreed to issue to contractor personnel certain items of U.S. government property. Contractor personnel are permitted to use this equipment to carry out their responsibilities under the ▬▬ contract, but it remains the property of the U.S. government.

*USPC Employment 2018-2024*

13. **EDD** was until recently a permanent employee of the USPC. His job title since 2018 was Human Resources Specialist, Employee Labor Relations Expert and his duties included advising and representing USPC on employee labor relations to include disciplinary, conduct and performance issues. On November 19, 2024, **EDD** was placed on administrative leave from USPC as a result of an investigation by USPC OIG into, in part, the inappropriate use of USPC time and inappropriate transmission of USPC data. Following the action, **EDD** retired from USPC on December 6, 2024.

14. USPC policy and regulations did not permit **EDD** to use personal electronic equipment or a personal email account to conduct official business or to transmit USPC information.

15. In June 2023, USPC had extended **EDD**'s appointment by an additional five years. Upon his retirement in December 2024, USPC was paying **EDD** an annualized salary of

$191,900.00 with a pay grade of FP2, step 14.

16. **EDD**'s work hours for Peace Corps were Monday through Friday from 0800 to 1630. On Mondays, Tuesdays, and Wednesdays, **EDD** would work within the Peace Corps physical space in Washington, D.C. On Thursdays and Fridays, **EDD** would telework for USPC from his residence located at in Silver Spring, Maryland.

17. **EDD** received numerous required annual trainings from the Department of State and USPC. Some of the trainings **EDD** received on an annual basis included Privacy Act Awareness, Records Management, Telework Fundamentals and Cyber Awareness Training.

18. **EDD** viewed multiple warning banners when accessing USPC, FHFA and NRC systems. **EDD** was given codes of conduct and rules for behavior from employers and signed binding non-disclosure agreements in which he agreed he would not distribute specified documents such as Controlled Unclassified Information (CUI).

*Employment from April to June 2023*

19. In March 2023, **EDD** asked USPC's ethics team for an ethics opinion on potential outside employment with ▬▬▬▬▬▬ (▬). In his written request, **EDD** referred to 18 U.S.C § 205 and stated, "there is no conflict, and I would not be employed as an agent or attorney, either for the contracting company nor the other federal agency." **EDD** stated he would make an hourly wage from ▬. The USPC ethics team stated that there were no ethics concerns as he would not contract for an intelligence agency, would not disclose nonpublic information, and would not use Peace Corp time and equipment in performing his outside employment activities. The ethics team approved his outside employment on April 20, 2023, based on the information provided.

20. In or around April 2023, **EDD** began working for ▬, serving FHFA under a

General Services Contract (GSA) for Human Resources, Employee Labor Relations Contract.

21. While assigned to the ▮ contract, **EDD** was authorized to work remotely and to use and store the issued U.S. government property at his home. He was not authorized to send official FHFA email or documents through any personal email account or to store FHFA information on personal electronic equipment. Prior to his employment with ▮, **EDD** signed a Non-Disclosure Agreement for FHFA outlining their policies regarding the use and control of CUI.

22. FHFA's contract with ▮ stated that contractors must perform the services "during normal business hours as approved by the COR, Monday through Friday, 8:30 AM through 5 PM." A representative of FHFA OGC stated in an interview that was conducted during this investigation that **EDD** was expected to work 40 hours per week on the ▮ contract. The representative also provided **EDD**'s timecards showing **EDD** claimed that he worked 8 hours every business day from April 24, 2023, through June 7, 2023.

23. **EDD** fraudulently claimed he worked approximately 248 hours—for which he was paid approximately $28,661.00, excluding benefits and employer contributions.

24. During this same time period, April 24, 2023, through June 7, 2023, **EDD** also claimed to have worked approximately 264 hours for USPC, for which he was paid approximately $23,290.38.

25. **EDD** certified multiple USPC timecards from his residence in Maryland using an internet-based connection to USPC (an agency headquartered in Washington, D.C.) for time periods from April 24 through May 6, 2023, May 7 through May 20, 2023, May 21 through June 3, 2023, and June 4 through June 17, 2023. The certifications resulted in payments being made by wire via direct deposit to his personal bank account with Wells Fargo, a company headquartered in San Francisco, California. The account routing number for **EDD**'s Wells Fargo account used

for direct deposit directed funds to Wells Fargo in Minneapolis, Minnesota where the funds were further credited to **EDD**'s bank account.

26. ▮ removed **EDD** from the FHFA contract and terminated his employment on June 7, 2023, based on his work being "sub-par," his writing being "not organized or confusing," and his failure "to start assignments given to him on May 8th and May 17th."

27. On July 24, 2023, FHFA contacted ▮ to inform them that **EDD** released FHFA CUI which included the Personally Identifiable Information (PII) of FHFA employees. The letter stated **EDD** sent four emails to an undisclosed aol.com email address and two emails to a ▮ ▮ executive. FHFA required that ▮ contact **EDD** and ensure that **EDD** had deleted all FHFA emails from his personal account. ▮ later confirmed to FHFA that they contacted **EDD**, and **EDD** had stated that he deleted the emails.

### ▮ *Employment from August to November 2024*

28. In or around August 2024, **EDD** began working for ▮, serving the NRC under a Human Resources, Employee Labor Relations contract.

29. In July 2024, to support his application for employment to ▮, **EDD** provided ▮ with the ethics opinion he had received from USPC in April 2023 in relation to his outside employment with ▮. The subject line of the email was "As discussed this morning (OGC approval of outside employment)."

30. In August 2024, **EDD** filed a Standard Form-86 (SF-86) seeking a security clearance for the work he would do for NRC on behalf of ▮. In the SF-86, he listed employment with "HUD/FHFA" from February 2023 through May 2023, employment that had not been listed on the resume he submitted to ▮.

31. In the SF-86 to the NRC, **EDD** denied having "close and/or continuing contact

with a foreign national within the last seven (7) years" to whom he was "bound by affection, influence, common interest, and/or obligation."

32. In September 2024, **EDD** requested that the USPC ethics team approve his outside employment for ▉ and provided the statement of work for his proposed ▉ position for their review. The ethics team expressed concern about **EDD** working for ▉ and referenced 18 U.S.C § 203 (Compensation in Matters Affecting the Government).

33. The USPC ethics team informed **EDD** that based on the statement of work, he would be "communicating to the NRC on behalf of ▉ on particular matters with the intent to influence and receiving compensation to do so." The ethics team further stated, "if you are doing any communication to NRC as part of the contract, you would be violating this criminal statue."

34. Despite that opinion, **EDD** began working for ▉ September 2, 2024, at an hourly rate of $93.88.

35. ▉ billed 111 total hours for **EDD**'s work for the calendar month of September 2024. During the onboarding process of **EDD** to the NRC contract, through ▉, the NRC Contracting Officer Representative (COR) expressed ethics concerns because **EDD** was also employed by USPC. The ▉ program manager conveyed to the COR that **EDD** would resign from USPC if he received the position with ▉ servicing NRC.

36. **EDD** did not resign from USPC after he began work for ▉.

37. In accordance with the contract between ▉ and NRC, the NRC issued **EDD** a Dell Latitude 5490 laptop computer, bearing serial number C3C3GR3. To access the computer and the NRC network, **EDD** also needed (and received) a U.S. government Personal Identity Verification (PIV) card (also known as a Common Access Card, or CAC). Both the computer and the PIV card remained the property of the U.S. government. In addition, the NRC provided **EDD**

with an NRC email account, evester.edd@nrc.gov, to use in support of the ▓▓▓ contract.

38. The ▓▓▓ contract with NRC required that work performed by contractors, including **EDD**, must be completed Monday through Friday between the hours of 0730 and 1730, thereby directly overlapping with the hours (0800 to 1630) of **EDD**'s employment with the USPC.

39. While assigned to the ▓▓▓ contract, **EDD** was authorized to work remotely and to use and store the issued U.S. government property at his home. He was not authorized to send official NRC email or documents through any personal email account or to store NRC information on personal electronic equipment.

40. In total, during his employment with ▓▓▓ from September 02, 2024, to November 22, 2024, **EDD** claimed he worked approximately 302 hours on 53 individual workdays, worth a total of approximately $27,859.50, excluding benefits and contributions made by the employing agency.

41. During this same time period, September 02, 2024, through November 22, 2024, **EDD** also claimed to have worked approximately 424 hours (on 53 individual days of work) for USPC, for which he was paid approximately $39,118.07.

42. A review of NRC-provided IP address data for **EDD**'s login history revealed several login activities for **EDD**'s NRC computer system at the address 11501 Maryland 97, Wheaton, Maryland. A Google maps search of that address revealed the location to be an alternate address for the apartment complex where **EDD** resided, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, which is located at the intersection of Blueridge Ave and Maryland 97. NRC records revealed there were twenty-two dates on which **EDD** logged in with his NRC computer from the area of his residence.

43. Additional information gathered from NRC regarding IP addresses used by **EDD**

for NRC work showed login activity from IP addresses associated with 111 N St. NE, Washington, DC. A Google maps search of that address shows it to be approximately one block from Peace Corp Headquarters at 1275 1st Street NE, Washington, DC, where **EDD** worked for USPC when in-office. A review of the timestamps related to the IP addresses associated with the Washington, D.C. address revealed NRC internet activity on seven different dates between October 20, 2024, and November 19, 2024, with all of the activity taking place between 7:34 a.m. and 4:01 p.m.

### *Review of NRC and USPC Email Activity*

44.     During a review of **EDD**'s NRC and USPC email accounts, the following was discovered:

   a.     A review of **EDD**'s NRC email account for the period between September 3 and October 9, 2024 showed approximately 21 emails had been sent from evester.edd@nrc.gov to ███@aol.com. There were no emails sent back to the NRC originating email. Samples of the emails and attached documents were reviewed. The emails and documents transmitted to the America Online (AOL) address contained privacy act information, PII, and agency non-public information. In addition, **EDD** sent multiple emails from his NRC email account to his Peace Corps account, eedd@peacecorps.gov, that contained NRC-specific privacy act information.

   b.     A review of **EDD**'s USPC emails sent between January 1, 2024, and November 14, 2024, identified approximately 100 emails that were sent from **EDD**'s USPC email account to **EDD**'s AOL email account. **EDD** transmitted sensitive USPC non-public documents, official use emails, and privacy act information to the ███@aol.com email address.

   c.     A review of **EDD**'s NRC email account for the period between October 14 and November 15, 2024 identified approximately 11 emails sent from evester.edd@nrc.gov to ███@aol.com and some were sent at times not within the contract hours. There were no emails

sent back to the NRC originating email during this period. The 11 emails and attached documents transmitted to **EDD**'s AOL address contained privacy act information, PII, and agency non-public information. Additionally, **EDD** sent multiple emails from his NRC email account to his USPC account, eedd@peacecorps.gov, that contained NRC-specific privacy act information.

45. On November 18, 2024, an agent from USPC OIG interviewed **EDD**'s supervisor. The supervisor explained that he had recently observed 3 open laptop computers at **EDD**'s Peace Corps workstation. The Supervisor confronted **EDD** about the laptops, and **EDD** said the laptops had been issued to him.

46. On November 18, 2024, a USPC OIG agent conducted surveillance of **EDD**'s workspace at the USPC office located at 1275 First St. NE, Washington D.C. 20526.  The agent observed 2 open laptops on the desk of **EDD**'s workstation and **EDD** actively working with both. One laptop had the NRC logo displayed with an NRC access card inserted into its reader. The second laptop had a USPC desktop with a USPC access card inserted into the machine.



47. On November 19, 2024, just prior to being placed on administrative leave, **EDD** was found to have both his NRC and USPC computers open, powered up, and logged in at his USPC workstation.

48. From September 1, 2024, to mid-November 2024, **EDD** entered his USPC hours for bi-weekly pay periods, and then saved, validated and affirmed validation of his entered times.

49. The system **EDD** used for entering USPC time and attendance data is known as GovTA. This system may be accessed on the USPC network or remotely.

50. USPC has confirmed through IP address logs that **EDD**'s Falsified time and attendance validations from early September through mid-November 2024 were completed when **EDD** was connected from his residence in Maryland to USPC servers in Washington, D.C.

51. Relying on the hours entered through GovTA, USPC paid **EDD** $39,118.07, via direct deposit to his Wells Fargo bank account.

### *Search Warrant Execution at EDD's Residence and Interview of EDD*

52. A court authorized search warrant was executed at **EDD**'s residence on November 27, 2024. In a non-custodial interview, **EDD** was informed that the interview was voluntary, he could leave at any time, that he had the right to refuse to answer questions or make statements that might tend to incriminate him, and that no disciplinary action could be taken against him for remaining silent. He was informed that anything he said or statement he furnished could be used in evidence in any future criminal, civil, or agency disciplinary or administrative proceeding.

53. **EDD** acknowledged that he had set up a company, "Federal HR Online," to potentially do government-related contract work, but that the company never had clients.

54. **EDD** told investigators that he maintained an online relationship with a Nepalese woman residing in Canada and two Nepalese women residing in Nepal. **EDD** claimed he met them

on TikTok forums to discuss politics and had supported them financially on occasion for various reasons, sending approximately $7,000 to them over the past two years. **EDD** acknowledged that he could not be sure that the women were who they claimed to be.

55.     **EDD** denied sending or receiving pornographic photographs and/or videos with the women. **EDD** claimed he interacted with the women via Instagram and TikTok and sent them money via his PayPal account that was affiliated with his HR company's email address, ███████@protonmail.com, and through TikTok.

56.     **EDD** also stated he maintained a CashApp account, however he denied using it to send funds overseas.

57.     A later review of **EDD**'s telephone revealed that he sent more than $20,000.00 to individuals overseas, some of whom he supported by paying their bills and rent. In exchange, **EDD** received nude images. **EDD** was in close relationships through electronic means with the overseas persons.

58.     **EDD** told investigators that the computer found in his apartment during the execution of the search warrant was purchased the week prior (shortly after he was escorted out of USPC offices) and that he had not owned another personal computer for close to a year.

59.     **EDD** stated he gave his previous computer to a Nepalese woman he knew in Canada who had lived in Canada on a student visa. **EDD** claimed he wiped the computer prior to sending it, and no government documents existed on the computer.

60.     **EDD** stated he used his Apple iPhone as his primary device to access both his AOL and Proton Mail accounts, and to use PayPal, TikTok, and CashApp.

61.     **EDD** further stated he used his iPhone to print documents he sent from his government email addresses. Large quantities of printed USPC and NRC documents were located

in **EDD**'s residence.

62.   **EDD** could not explain why he only sent eighteen total emails from his USPC email account between September 2, 2024, and October 9, 2024, but on his NRC account, he sent one hundred and ninety-four emails over the course of that same thirty-day period.

63.   When challenged on why he did not disclose foreign contacts in the SF-86 submitted to ▮ in order to qualify for a security clearance, **EDD** said he was thinking of "physical" contact.

64.   Based on these facts, there is probable cause to believe that **EDD** knowingly transmitted PII, other privacy act information, and proprietary government documents to his personal email address and personal electronic devices from his FHFA-issued, NRC-issued, and USPC issued laptop computers, in violation of 18 U.S.C. § 641 (theft of government property).

65.   There is also probable cause to believe that **EDD** falsified his employment time records for the USPC and/or time records relied on by ▮ for its submissions to NRC, or relied on by ▮ for its submissions to FHFA, and that **EDD** submitted a false statement on his SF-86 form regarding foreign contacts, all in violation of 18 U.S.C. § 1001 (false statements and representations) and 18 U.S.C. § 1343 (wire fraud).

66.   There is probable cause to believe that at least some of the money paid to **EDD** as a result of his double-billing scheme was sent to third parties overseas.

*Court Issued Search Warrant*

67.   Pursuant to the previously issued warrant, a forensic copy of **EDD**'s Apple iPhone was made, to include multiple electronic storage devices. The forensic copy was reviewed for items and information as set forth in the warrant. Numerous emails and documents from **EDD**'s AOL account were found to contain hundreds of documents with PII and agency-sensitive

information.

68.     **EDD**'s electronic devices were found to contain over one thousand sensitive agency emails, documents, social security numbers, administrative actions, evaluations, Department of Treasury documents, life insurance and beneficiary documents, security clearance determination documents, disciplinary actions, Standard Form 50s for many employees, Family Medical Leave documents, termination notices, performance improvement plans, employee suspensions, separation agreements, grievance letters, downgrade letters, union grievance decisions, desk audits, Office of Inspector General documents, word document detailing 7 OIG referrals made including the employees names, case numbers, and case disposition/punishments, harassment claim files and images, and excessive amounts of personally identifiable information. The documents and information were stored on **EDD**'s devices. The documents and information were not returned to the United States government when **EDD** was placed on administrative leave from USPC or left prior agency contractors.

69.     When **EDD**'s personal electronic devices were searched, the following terms appeared with the indicated frequency: NRC – 2,120,433 times, SSN – 1,005,630 times, Secret – 1,362 times, CUI – 1,014 times, Confidential – 909 times, Social Security Number – 238 times, China – 223 times, Treasury – 205 times, two jobs – 62 times, FOUO – 45 times and two companies – 2 times.

70.     While reviewing text messages to determine whether United States government information had been distributed via text, an investigator noticed at least one email in which **EDD** mentioned his double-dipping scheme to a third party and multiple messages with pictures. This was found under the search terms "two companies" (two hits) and "two jobs" (62 hits).





> **Received** 11/13/2024 10:21:29.000 PM
>
> So are you bouncing your two jobs OK? Hey, can I call or do you wanna keep texting?

> **Sent**
> **Local User <PhysicalDrive1 NVMe Samsung SSD 980 PRO 2TB (1.82 TB)>**
> 11/13/2024 10:28:38.000 PM
>
> x☐I'm cool for a call during the day. Recently my agency started requiring people to work in office 3d a week. The mayor was concerned that businesses were losing money with folks working at home. Now I go in the office Monday to Wednesday. It's funny now, I guess. I have the 2 laptops on my desk in the office. No one complains because the office usually is half full

> **Sent**
> **Local User <PhysicalDrive1 NVMe Samsung SSD 980 PRO 2TB (1.82 TB)>**
> 11/13/2024 10:29:42.000 PM
>
> Sometimes I have online meetings with the other agency. I just have to keep a tight schedule, especially to have meetings only on days I'm home

> **Sent**
> **Local User <PhysicalDrive1 NVMe Samsung SSD 980 PRO 2TB (1.82 TB)>**
> 11/13/2024 10:30:10.000 PM
>
> I'll give you a call tomorrow around lunchtime

641



## **CONCLUSION**

71.     Based on the foregoing, your affiant submits there is probable cause to believe that **EDD** violated 18 U.S.C. § 641 (theft of government property) by embezzling, stealing, purloining, or knowingly converting to his use or the use of another, any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made

or being made under contract for the United States or any department or agency thereof, where the value of the property exceeds $1000.

72. Based on the foregoing, your affiant submits there is probable cause to believe that **EDD** violated 18 U.S. Code § 1001 (a) (statements or entries generally) which makes it a crime for one to knowingly and willfully falsify, conceal, or cover up by any trick, scheme, or device a material fact; makes any materially false, fictitious, or fraudulent statement or representation; or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

73. Based on the foregoing, your affiant submits there is probable cause to believe that **EDD** violated 18 U.S. Code § 1343 (fraud by wire, radio, or television) by devising a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and transmitting and causing to be transmitted by means of wire, in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

Respectfully submitted,

*Sparky Edwards*
Sparky D. Edwards
Senior Special Agent
Office of Inspector General,
United States Peace Corps

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 26th day of June, 2025.

_____
The Honorable Timothy J. Sullivan
Chief United States Magistrate Judge